UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------X
                                   :
Eileen Henderson,                  :
                                   :
            Plaintiff,             :
                                   :    <u>REPORT & RECOMMENDATION</u>
      -against-                    :    04 Civ. 4553 (CLB)(MDF)
                                   :
                                   :
Regeneron Pharmaceuticals, Inc.,   :
                                   :
            Defendant.             :
----------------------------------X

TO:  THE HONORABLE CHARLES L. BRIEANT, U.S.D.J.

     In June 2004, Eileen Henderson[1] commenced this action

against her former employer, Regeneron Pharmaceuticals

("Regeneron"), pursuant to Title VII of the Civil Rights Act of

1964, 42 U.S.C. §§ 2000e *et seq.*, as amended by the Civil Rights

Act of 1991 ("Title VII"), and the New York Human Rights Law,

N.Y. Exec. Law § 296, asserting claims of gender discrimination,

sexual harassment, and retaliation.  In addition to her

employment discrimination claims, Henderson raises a claim of

intentional infliction of emotional distress.  Regeneron has

moved for summary judgment pursuant to Rule 56 of the Federal

Rules of Civil Procedure.  For the following reasons, it is

respectfully recommended that your Honor grant Regeneron's motion

---

[1] Henderson initiated this action *pro se* by filing a form
complaint.  At the first pre-trial conference, Henderson appeared
with an attorney, Susan B. Egan, Esq., who subsequently filed a
notice of appearance and an amended complaint and has continued
to represent Henderson throughout these proceedings.

1

for summary judgment in its entirety.

BACKGROUND

I.   <u>Factual Background</u>

From January 8, 2001 to November 10, 2003, Henderson was employed as a data input clerk in Regeneron's Shipping and Receiving Department.  *See* Amended Compl. at ¶ 1.

A.   <u>February 2003 Incident</u>

In February 2003, Henderson and Joe Resi, a supervisor in the Shipping and Receiving Department, got into a verbal altercation over a missing narcotics package.  *See* Regeneron's Ex. C. (Transcript of Eileen Henderson's Deposition)("Henderson Trans.") at 172-73.  When Resi could not locate the narcotics package, he commented that he did not want to sign for anymore packages and Henderson, thinking he was joking, laughed.  *See id.* at 173-74.  When Resi heard Henderson laugh, he said, "What is so fucking funny.  Why are you if you canning [sic] laughing?"  *Id.* Henderson was upset by Resi's reaction and, when he did not apologize to her, she reported the incident to Gail Grimaldi, the director of organization, training, and development at Regeneron. *See id.* at 177.  Henderson told Grimaldi that she was upset because Resi had yelled at her and used profanity.  *See* Affidavit of Gail Grimaldi ("Grimaldi Aff.") at ¶ 16.  She also complained that the men in department used bad language and did not treat her like a lady.  *See* Henderson's Ex. F (Transcript of Gail

2

Grimaldi's Deposition)("Grimaldi Trans.") at 107. Henderson, however, never stated that she felt like any of these issues related to the fact that she is a woman or that she felt harassed. *See id*. at 110; Grimaldi Aff. at ¶ 16. Indeed, at her deposition, Henderson stated that she did not believe that what Resi had said to her was sexual harassment. *See* Henderson Trans. at 177. In response to Henderson's complaint, Grimaldi called a meeting to discuss Henderson's concerns. *See id*. at 183. After the meeting, Resi apologized to Henderson for the language that he had used toward her. *See id*. at 183-84.

> B.  <u>Henderson's Complaints Regarding an Office Key and a Pager</u>

During her meeting with Grimaldi, in addition to reporting the incident that had occurred with Resi, Henderson complained that she had not received a key to the Shipping and Receiving Department's office. *See id*. at 182. Grimaldi subsequently approached Joanne Deyo, the head of Regeneron's Facilities Department, and told her about Henderson's complaint regarding the key. *See Affidavit of Joanne Deyo* ("Deyo Aff.") at ¶ 3. Deyo then spoke with Robert Hoyt, the manager of the Shipping and Receiving Department, and learned that Henderson did not require her own key to the office because, by the time she arrived each morning, someone was already in the office. *See id*. at ¶ 4. She also learned that Henderson had access to the master set of keys that Hoyt routinely left on his desk. *See id*. Despite this,

Deyo instructed Hoyt to give Henderson a key, as there was no significant cost to Regeneron in doing so. *See id.* Later that day, Hoyt apologized to Henderson and gave her a set of keys. *See* Henderson Trans. at 183.

Henderson also complained to the Human Resources Department that she, unlike the other members of the Shipping and Receiving Department, was not provided with a pager.[2] *See* Henderson's Ex. A at 56 (Transcript of Robert Hoyt's Deposition ("Hoyt Trans.")); Henderson Trans. at 185-87; Deyo Aff. at ¶ 5. Although Hoyt twice attempted to obtain a pager for Henderson, Regeneron denied her requests, finding that, as a data entry clerk who primarily worked at her desk and on the loading dock where telephones were readily available to her, Henderson did not need a cellular telephone. *See id.*; Hoyt Trans. at 56; Henderson Trans. at 185-87. Unlike other members of the Shipping and Receiving Department, Henderson did not make deliveries throughout the Regeneron complex, therefore, Regeneron could not justify the expense of providing her with a pager. *See* Deyo Aff. at ¶ 5.

C.  Henderson's Complaints Regarding Overtime

Henderson alleges that Regeneron discriminated against her on the basis of her gender by denying her the opportunity to work

---

[2] Henderson's use of the term "pager" in her complaint refers to the cellular telephones that Regeneron issued to certain employees. For the sake of consistency, I will use the term pager throughout this Report and Recommendation.

overtime.  At her deposition, Henderson testified that she did
not know how overtime was assigned at Regeneron and that she
never asked Hoyt, her supervisor, about getting overtime hours.
*See* Henderson Trans. at 362-63.  She explained that there was no
opportunity for overtime in the Shipping and Receiving Department
and that, occasionally, employees from Shipping and Receiving
could work overtime in the Facilities Department.  *See id*. at
364.  On one occasion, Henderson approached Mike Kaplan, who runs
the Facilities Department with Deyo, and asked him for overtime
hours, which she received.  *See id*. at 365-66.  Henderson further
stated that she never asked Joanne Deyo for overtime.  *See id*. at
366-67.  She asserted that her co-workers in Shipping and
Receiving, Eugene Thomas and Tyrone Gerald, took all of the
overtime hours and told her that she could not have the hours.
*See id*. at 365-66.  Henderson acknowledged, however, that Gerald
and Thomas, were not authorized to assign overtime hours.  *See
id*. at 366.  When asked why she never asked Kaplan for more
overtime, Henderson stated, "What I am going to him everyday for
overtime?  That doesn't work that way."  *Id*.

    D.   <u>Henderson's Performance and Discipline Record</u>

On May 24, 2001, two female employees in Regeneron's
Purchasing Department complained to their manager about a comment
that Henderson had made while in the Purchasing Department.  *See*
Henderson's Ex. A at 27-32.  Hoyt was directed to give Henderson

a letter of warning about the incident.  *See id.* at 31.  The

letter stated, in relevant part,

> This letter is a warning, for your lack of
> professionalism pertaining to a statement you made on
> Thursday 5/24/01 while in the purchasing department
> located at g-level.  Your comment, that you saw as
> playful was taken offensively by two female employees
> of that department . . . .  Should another complaint
> be registered against you, it will leave me no
> alternative but to have Regenerons [sic] V.P. of Human
> Resources investigate these matters, at which time
> your working status will then be determined by this
> company.

Regeneron's Ex. H (May 25, 2001 Memorandum).

On November 28, 2001, Henderson and Hoyt completed

Henderson's 2001 Performance Evaluation.  *See* Regeneron's Ex. P

(Evaluation).  Hoyt gave Henderson an overall rating of "Needs

Improvement."  *See id.*  In the comments section, Hoyt noted,

*inter alia*, that Henderson needed improvement in some areas and

needed "to present herself with more professionalism."  *Id.* One

year later, in November 2002, Henderson and Hoyt completed

Henderson's 2002 Performance Evaluation.  *See* Henderson's Ex. H

(Evaluation).  Hoyt gave Henderson an overall rating of "Fully

Achieves Expectations and Standards" and noted that she had

"improved from a year ago" and that "she takes her position more

seriously than in the past."  *Id.*

Documents from Henderson's personnel file submitted by

Regeneron in support of its motion for summary judgment reveal

that Henderson had problems arriving to work on time and with

attendance.  On March 26, 2002, Henderson, who was expected to report to work by 8:30 a.m., called Hoyt at 8:40 a.m., stating that she could not come to work because she was at the emergency room with her son, who was ill.  *See* Regeneron's Ex. Q (March 26, 2002 Memorandum).  At 8:47 a.m., Hoyt received a call from Henderson's son, asking to speak with his mother.  *See id*. Henderson's son informed Hoyt that Henderson was not with him. *See id*.  Two days later, when Henderson returned to work, Hoyt asked her about the phone call he had received from her son.  *See id*.  Henderson told Hoyt that her son was sleeping when she went to the pharmacy to get his medicine and that was when he tried to call her at work.  *See id*.

On March 7, 2003, Henderson left a voice mail for Hoyt stating that she would be late because she had to attend a meeting at her son's school.  *See* Regeneron's Ex. W (March 7, 2003 Memorandum).  Later that day, she left another voice mail calling in sick and stating that "she had to go the district office to reinstate Chris."  *Id*.  Hoyt charged her with a personal day, rather than a sick day because her absence had to do with her son's schooling, not an illness.  *See id*.; Grimaldi Aff. at ¶ 19.

On the afternoon of March 20, 2003, Henderson left work to go to a medical appointment.  *See* Regeneron's Ex. X (March 20-21, 2003 Memorandum).  She was instructed to report back to work

after the appointment. *See id*. Henderson, however, never returned, even though the appointment ended at approximately 2:40 p.m. *See id*. When asked the following day why she did not return to work or call, Henderson simply stated that "she forgot." *Id*.

On April 3, 2003, Hoyt asked Henderson to key in all of the inventory sheets for the day; however, she left at 5:00 without completing the task. *See* Regeneron's Ex. Y (April 3-4, 2003 Memorandum). The next day, when asked why she had not done as she was told, Henderson told Hoyt that "she forgot." *See id*. At her deposition, Henderson denied ever leaving work without completing her tasks. *See* Henderson Trans. at 238-39.

On April 4, 2003, Henderson called Hoyt at 8:40 a.m. to say that she would be late because her car had a flat tire. *See* Regeneron's Ex. Z (April 4, 2003 Memorandum). Hoyt reminded Henderson that she was required to call before 8:30 a.m. if she was going to be late. *See id*. Henderson responded by telling Hoyt that it was hard for her to get to work by 8:30 a.m. because she had trouble getting her son ready for school. *See id*. Hoyt advised Henderson that, if she could not arrive by 8:30, she could make up the extra time after 5:00 p.m. *See id*.

At 2:45 p.m. on April 7, 2003, Henderson left work after it began to lightly snow. *See* Regeneron's Ex. AA (April 7, 2003 Memorandum). Although Hoyt told her to wait to see if the

company planned on closing early, Henderson stated, "I am not waiting, I am going." *Id*. Henderson testified at her deposition that she had permission from Hoyt to leave early that day, but was told that she would not get paid for the entire day. *See* Henderson Trans. at 246-47.

The following day, before 8:30 a.m., Henderson called Regeneron to say that she would be late because she had to take her son to the doctor. *See* Regeneron's Ex. BB (April 8, 2003 Memorandum). Henderson did not report this directly to Hoyt, as required. *See id*. Hoyt memorialized this in Henderson's personnel file and reminded Henderson that she must contact him directly to report any instances of lateness. *See id*.

On April 14, 2003, without authorization from Hoyt, Henderson asked an employee in the Payroll Department to alter her time sheet by applying two half-days of personal time in order to make up for her two-hour lateness on April 4, 2003 and her two-hour early departure on April 7, 2003. *See* Grimaldi Aff. at ¶ 25; Hoyt Trans. at 109-13; Regeneron's Exs. CC (unaltered time sheet); DD (altered time sheet); EE (April 14, 2003 e-mail from Payroll Department employee to Henderson); and FF (April 14, 2003 Memorandum).

On June 3, 2003, Henderson called Hoyt to inform him that she would be late to work due to car trouble. *See* Regeneron's Ex. GG (June 3, 2003 Memorandum). Hoyt noted Henderson's

tardiness in her personnel file. *See id*.

On June 11, 2003, Henderson arrived over a half an hour late to a Power Point seminar that she had requested to attend. *See* Regeneron's Ex. HH (June 11, 2003 Memorandum). According to Hoyt's memorandum to Henderson's personnel file, Henderson left the loading dock at 11:55 a.m. for the 12:00 p.m. seminar, but did not arrive until after 12:30 p.m. *See id*. Hoyt issued a warning to Henderson and included a copy of the warning in her personnel file. *See* Regeneron's Ex. II (Employee Warning Notice). In the employee comments section of the warning notice, Henderson indicated that she had thought the seminar started at 12:30 and had left the loading dock at 12:20, not 11:55. *See id*.

On August 11, 2003, Hoyt sent an e-mail to the Shipping and Receiving Department employees, informing them that paychecks could not be distributed the day before payday, even if an employee would not be at work on payday. *See* Regeneron's Ex. KK (August 11, 2003 e-mail). Henderson approached Hoyt about this e-mail and told him that, if she could not get her paychecks on Wednesdays, then she would not come to work on Thursdays. *See id*. (August 11, 20003 Memorandum). In her declaration in opposition to Regeneron's summary judgment motion, Henderson denies approaching Hoyt about the e-mail. *See* Henderson Decl. at ¶ 29.

On August 27, 2003, a Regeneron veterinarian complained to

10

Grimaldi that Henderson was spending too much time with the Regeneron vivarium staff and distracting them from their work. *See* Regeneron's Ex. UU at 3 (personnel chart regarding Henderson); Grimaldi Aff. at ¶ 31; Deyo Aff. at ¶ 7.

In October 2003, another warning was issued to Henderson after she accused one of her co-workers, Tyrone Gerald, of breaking a space heater that was kept in the Shipping and Receiving office and threatened to "have someone meet him after work." Regeneron's Ex. NN (Employee Warning Notice); *see* Henderson's Ex. D at 70-77. Henderson denied making the threat. *See id*.

E.  <u>October 2003 Incident</u>

On October 8, 2003, Henderson got into a verbal and physical altercation with another Regeneron employee, Mike Parker. A couple of weeks prior to the incident, Henderson, Parker, and Eugene Thomas had agreed to bring peanut butter, jelly, and bread to the office for all of the employees to share. *See* Henderson Trans. at 282-83. After two weeks passed and Parker had still not brought in his contribution, Henderson asked him where it was and a heated verbal exchange ensued. *See id*. at 283-85. Henderson testified that, after she told Parker that if he continued to speak to her in that manner she would go to the Human Resources Department, Parker lunged toward her and pushed her into the copy machine. *See id*. at 285. She stated that,

when Parker came toward her, she was holding a plastic knife in her hand that had peanut butter on it and that, to shield herself, she held her hands up. *See id*. According to Parker, Henderson struck him in the face with the plastic knife and smeared peanut butter on him. *See* Regeneron's Ex. SS (Transcript of Mike Parker's Deposition)("Parker Trans.") at 53-56. Henderson testified that, when she was able to free herself, she ran to her office to call the Human Resources Department, but no one answered the phone. *See* Henderson Trans. at 285. As a result of this incident, Henderson sustained a bruise to her right leg. *See* Henderson's Ex. J (photographs of Henderson's leg); Henderson Decl. at ¶ 36.

At his deposition, Parker testified that, during the argument, Joe Resi and Eugene Thomas came into the room and broke up the fight. *See* Parker Trans. at 53. Resi told Henderson to go for a walk, but Henderson refused. *See id*. Parker then left to go to the Human Resources Department to speak with Grimaldi. *See id*. at 54. When Grimaldi arrived at the Human Resources office, Henderson and Parker were sitting in separate offices telling Hoyt and Deyo what had happened. *See* Grimaldi Trans. at 152. Grimaldi spoke with both Henderson and Parker. According to Grimaldi, Henderson "complain[ed] of the shouting and that they argued and the language and that [Parker] pushed her." *Id*. at 155. Grimaldi also states in her affidavit that Henderson

never suggested that this altercation occurred because of her gender or that she perceived it to be any form of sexual harassment. *See* Grimaldi Aff. at ¶ 39. After hearing both sides of the story, Grimaldi suspended both Henderson and Parker with pay pending an investigation of the incident and advised them not come back to work until they were called. *See id*. at 155-56. As a result of the investigation, Grimaldi and others in the Human Resources Department concluded that Henderson and Parker were equally responsible for the incident and suspended them for one week without pay. *See id*. at 178-79; Grimaldi Aff. at ¶ 40; Deyo Aff. at ¶¶ 8-9. Despite being told not to come to work until she was called, Henderson showed up at Regeneron two days after the incident, at which time, Grimaldi informed her that she was suspended without pay for one week. *See* Grimaldi Trans. at 168-69.

On October 17, 2003, Henderson and Parker returned to work at Regeneron. *See* Grimaldi Aff. at ¶ 42. Grimaldi, Joanne Deyo, and Mike Kaplan met separately with both Henderson and Parker and advised them of their expectations of them going forward. *See* Grimaldi Aff. at ¶ 42; Deyo Aff. at ¶ 11. Both Henderson and Parker were issued letters of reprimand outlining why their behavior on October 8, 2003 was inappropriate and setting forth conditions of continued employment. *See* Regeneron's Exs. L and TT (October 17, 2003 Memoranda). Both letters explained that

13

Henderson's and Parker's conduct was worthy of dismissal and that
there would be "zero tolerance" for conduct of this nature in the
future. *See id* Henderson and Parker both signed the letters of
reprimand that day. *See id*. Also on that day, Hoyt promulgated
and distributed to the entire Shipping and Receiving Department
written guidelines and standards. *See* Regeneron's Ex. M (October
17, 2003 Memorandum). Among these guidelines and standards was a
requirement that all personnel adhere to the Department's working
hours – 8:30 a.m. to 5:00 p.m. with a half an hour for lunch.
*See id*. Henderson and the other members of the department signed
copies of the written guidelines, indicating that they had read
them and agreed to abide by them. *See id*.

    F.   <u>Henderson's Termination</u>

After her suspension, Henderson continued to violate the
rules and guidelines. On October 31, 2003, Hoyt prepared a
memorandum, memorializing Henderson's absences since her return
from her one-week suspension. *See* Regeneron's Ex. N (October 31,
2003 Memorandum). Hoyt indicated that, since her suspension,
Henderson had been late or absent without permission three times
and that, as of September 10, 2003, she had exhausted all of her
sick/personal and vacation time. *See id*. Hoyt warned Henderson
that any future unapproved absences would result in her
termination. *See id*. On November 11, 2003, Hoyt held a meeting
with Henderson and Mike Kaplan, at which time he gave Henderson

the October 31, 2003 memorandum.  *See* Regeneron's Ex. QQ
(November 3, 2003 4:40 p.m. Memorandum).  After receiving the
memorandum, Henderson stated, "You'll be sorry you gave this to
me, cause two can play this game."  *Id*.

On November 4, 2003, Henderson failed to enter all of the
packing slips into the Shipping and Receiving Department's log
books and left work at the end of the day without telling anyone
that she did not complete this task.  *See* Regeneron's Ex. UU at
5; Grimaldi Aff. at ¶ 50.  On November 6, 2003, Henderson again
failed to enter the packing slips into the log books.  *See*
Grimaldi Aff. at ¶ 52.  The following day, when Hoyt asked her
why she had not entered the slips, Henderson refused to accept
responsibility and spoke disrespectfully to Hoyt, stating that he
would "hang" and that "two can play this game."  *See* Hoyt Trans.
at 80.  Henderson asserts that, from the time that she was
suspended to the time that she was terminated, she did all of her
assigned work.  *See* Henderson Decl. at ¶ 39.

On November 5, 2003, Henderson attended an on-site first aid
course that was offered by Regeneron.  *See* Deyo Aff. at ¶ 12.  In
her affidavit in support of Regeneron's summary judgment motion,
Joanne Deyo stated that, during the course, she observed
Henderson engaging in inappropriate and unprofessional behavior,
shouting out "Jesus Christ" at several points during the
presentation.  *See id*.; Regeneron's Ex. UU at 5.

On November 10, 2003, Mike Kaplan, Hoyt, Deyo, and Grimaldi decided to terminate Henderson's employment. *See* Grimaldi Aff. at ¶ 57; Deyo Aff. at ¶ 14; Hoyt Trans. at 80-83. According to Grimaldi's and Deyo's affidavits, Henderson was terminated due to her "longstanding and ongoing pattern of failure to follow reasonable instructions from her supervisors and her lack of professionalism, including her pattern of recurrent lateness and insubordination." Grimaldi Aff. at ¶ 57; *see* Deyo Aff. at ¶ 14.

G.   Regeneron's Sexual Harassment Policy

At all relevant times, Regeneron maintained a written sexual harassment policy that was posted throughout the Regeneron facility and on its intranet website. *See* Grimaldi Aff. at ¶ 4; Rgeneron's Ex. O (Policy). The written policy provided a definition of sexual harassment and instructed employees to report any instances of sexual harassment to a supervisor, the Human Resources Department, or any other member of the management. *See* Regeneron's Ex. O. Every new employee at Regeneron must participate in a mandatory orientation, during which the sexual harassment policy is explained through a video presentation and discussion and a quiz is administered to ensure that the new employees understand the policy. *See* Grimaldi Aff. at ¶ 5; Grimaldi Trans. at 25-26. In addition to the training that is part of the new employee orientation, every Regeneron employee must participate in an annual sexual harassment training

16

class, which consists of a video, discussion, a game or interaction, and a quiz. *See* Grimaldi Aff. at ¶ 6; Grimaldi Trans. at 27-28. Employees must complete the annual class in order to be eligible for a raise. *See id*. at ¶ 7. Henderson attended an annual sexual harassment training class on July 29, 2002. *See* Regeneron's Ex. R (sign-in sheet and quiz); Henderson Trans. at 67-70, 139-46.

II. Procedural History

On November 13, 2003, Henderson filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC"). *See* Regeneron's Ex. G (Henderson's *Pro Se* Complaint and Attachments). In response to the question regarding how she had been harmed, Henderson provided the following answer:

> Pay, discipline, discharged, harassment, (sexual)?
> humil[i]ated, embar[ra]ssed, and ass[a]ulted. Spoken
> to with vulgar language and disrespectful hostile tune
> (in front of my supervisor).

*Id*. at attached questionnaire. On March 15, 2004, the EEOC concluded that it would be unable to process Henderson's charge within 180 days and issued Henderson a right to sue letter. *See id*. at Notice of Right to Sue.

III. Complaint and Deposition Testimony

A. Complaint

On June 17, 2004, Henderson commenced the instant lawsuit. Specifically, Henderson claims that: (1) Regeneron discriminated against her on the basis of her gender by failing to provide her

with a pager, a key to the Shipping and Receiving Department, and the opportunity to work overtime; (2) she was subjected to a hostile work environment; and (3) "[a]s a direct result of [her] complaint to the Human Resources Department in February 2003, the harassment and discriminatory conduct and speech of [her] supervisor and co-workers grew more hostile and humiliating" and, in retaliation for reporting an incident that she had had with a co-worker in October 2003, she was suspended without pay and subsequently terminated. *See* Amended Compl. at ¶¶ 24-39. Additionally, Henderson asserts a claim of intentional infliction of emotional distress based on Regeneron's alleged failure to protect her from the unwanted and offensive conduct of her co-workers and supervisor and the assault by Mike Parker. *See id*. at ¶¶ 43-51.

In support of her claim of sexual harassment, Henderson alleges that the atmosphere in the Shipping and Receiving Department was "like a men's lockeroom," in that the men often wrestled and groped each other and made sexual comments that made her feel uncomfortable. *Id*. at ¶ 9. On one occasion when Henderson complained about their behavior, one of her co-workers accused her of being upset because they did not include her in their antics and proceeded to rub his hands up and down her legs "as if to show her what it would be like i[f] she was included in the 'fun.'" *Id*. at ¶ 11. Henderson asserts that another co-

worker told her that "she needed a 'man'" and that he wanted to "take her out and treat her 'like a lady.'" *Id*. at ¶ 12.  He also commented that she looked "sexy," "howled like a wolf causing the other men in the department to laugh," and rubbed her back, telling her that she needed a massage to relieve her tension. *Id*.  Henderson further alleges that the men in the Shipping and Receiving Department often commented on her weight and the fact that she was missing a tooth by calling her names like "Gums" and "Ms. Seafood."  *Id*. at ¶ 13.  She states that the men also touched and made fun of her hair.  *See id*.  Additionally, Henderson states that one of her male co-workers complained that Henderson was being paid more than him and that this was wrong because he "was the man."  *Id*. at ¶ 19.  Henderson also alleges that the February 2003 incident with Joe Resi and the October 2003 "attack" by Mike Parker contributed to the hostile work environment.  *See id*. at ¶¶ 16, 20.  Finally, Henderson asserts that, despite her repeated complaints about her co-workers' behavior, neither her supervisor nor the Human Resources Department took any action.  *See id*. at ¶ 31.

With respect to her retaliation claim, Henderson alleges that, when she returned to work after her suspension, "[h]er co-workers and supervisor refused to speak with her and did not give her any work to perform."  *Id*. at ¶ 22.  She further states that, after her February 2003 complaint, "[i]n conversations among her

supervisor and the men in the department spoken deliberately loud enough for [her] to hear, they faulted [her] for 'not being one of the guys' and agreed that she should be terminated for going to Human Resources with her complaints about the conditions of her employment." *Id*. at ¶ 35.

    B.   <u>Deposition Testimony and Other Evidence</u>

        1.   <u>Henderson's Deposition</u>

At her deposition, Henderson reasserted most of the allegations in her complaint. Counsel asked Henderson whether there was ever a point in time that she felt she was experiencing sexual harassment and Henderson responded, "A little bit." Henderson Trans. at 147. She testified that she first began to experience what she believed to be sexual harassment in 2003, after Eugene Thomas and Mike Parker were hired. *See id*. When asked whether she experienced any sexual harassment prior to 2003, Henderson stated that her co-worker, Tyrone Gerald, had a "hand problem," meaning that he touched her. *See id*. at 148. However, Henderson testified that, at the time, she did not believe that Gerald's conduct constituted sexual harassment. *See id*. In response to counsel's question as to whether having gone through sexual harassment seminars at Regeneron caused her to believe that Gerald's conduct was sexual harassment, Henderson stated, "A little bit." *Id*. at 149. Henderson further testified that Mike Parker put his hands on her legs and told her that they

should "hang out" and that he would "treat [her] like a lady."
*Id*. at 150. She also stated that the men often called her
"Gums," "Seafood," and "Wheezy" and made comments about her hair.
*Id*. at 150-53. Henderson, however, stated that, at the time of
all of the behavior that she alleged took place in 2003, she did
not feel that she was being sexually harassed. *See id*. at 147-
52, 54. During her deposition, counsel asked Henderson whether
anything else happened at Regeneron between February 2, 2003 and
October 8, 2003 that made her feel uncomfortable that she had not
already stated and Henderson indicated that she had testified to
everything that affected her. *See id*. at 281-82. Henderson also
testified about the treatment she received from Hoyt and her co-
workers after making complaints to the Human Resources
Department. She stated that, after she went to the Human
Resources Department in February 2003, "[t]here w[ere] a few
comments made. Mike Parker stated, oh, you like going to HR. You
like running to HR." *Id*. at 192-93. She also stated that Hoyt
made a similar comment. *See id*. at 193. Henderson also
indicated that, after she made complaints, her co-workers and
Hoyt spontaneously stopped talking to her and began excluding her
from their conversations. *See* Henderson Trans. at 179, 209-11,
260, 272, 414-15.

2. Grimaldi's Deposition

At her deposition, Gail Grimaldi testified that Henderson

21

occasionally came to see her to discuss concerns that she had
with the Shipping and Receiving Department. *See* Henderson's Ex.
112-13. According to Grimaldi, Henderson's specific complaints
concerned the language used by her co-workers, that she felt left
out of conversations among the Shipping and Receiving employees,
and that she felt her co-workers were "rough." *See id*. at 115-
17. Grimaldi also stated that Henderson often sought advice from
her about her job and how to be a good employee. *See id*. at 125-
26. Grimaldi stated that she served as an advocate for Henderson
and advised her as to how she could enhance her position at
Regeneron. *See id*.

With respect to Henderson's discipline record, Grimaldi
testified that, "[f]rom the very beginning[,] [Henderson]
constantly was having work issue problems," specifically, "[w]ork
subordination, insubordination, [and] time issues." *Id*. at 211.
When asked why there was very little documentation of these
problems during the years 2001 and 2002 Grimaldi explained that
Regeneron's "discipline process policy" is "strictly a guideline"
and that documentation of employee problems generally does not
occur until after the employee fails to respond to "verbal
counseling." *Id*. at 211-12.

3.  <u>Hoyt's Deposition</u>

During his deposition, Henderson's supervisor, Robert Hoyt,
testified that Henderson's performance deteriorated in 2003. *See*

Hoyt Trans. at 50-51.  Specifically, Hoyt stated that Henderson had a problem with lateness and failed to call in to say that she would be late, refused to do certain work, and did not attend a seminar that she had planned on attending.  *See id*.  Hoyt also testified as to the specific instances of Henderson's lateness that resulted in him writing notes to her personnel file and stated that he had noticed a pattern of lateness.  *See id*. at 60-70.  When asked whether he had placed notes in other employees' personnel files in 2003, Hoyt testified that he did not because he did not have any problems with the other employees.  *See id*. at 67-68, 73-74.  Finally, Hoyt testified that Henderson never complained to him that her co-workers engaged in the wrestling and "locker room" behavior that she described in her complaint, that any of her co-workers touched her or asked her out, or that any of her co-workers made derogatory comments to her.  *See id*. at 100-02.  Hoyt further stated that he did not witness any of this conduct.  *See id*.

### 4.   Henderson's Psychiatric Expert

After filing this lawsuit, Henderson underwent a psychiatric evaluation by Dr. Andrew P. Levin.  Levin prepared a report, in which he diagnosed Henderson with Posttraumatic Stress Disorder ("PTSD") and depression.  *See* Regeneron's Ex. D (Report of Dr. Andrew P. Levin) at 21.  Levin opined that these disorders were the result of the October 2003 incident with Mike Parker,

23

Henderson's termination from Regeneron, and the deterioration of her financial status. *See id*. at 23-24. Levin concluded that "Henderson experienced the conditions under which she worked at Regeneron as a hostile environment in which she felt disrespected, verbally abused, and excluded due to her gender." *Id*. at 26. He further stated that, in response to the "physical assault" by Mike Parker and her subsequent termination, Henderson developed PTSD and depression, which resulted in serious impairment in her occupational and social functioning. *Id*.

At his deposition, Levin was asked whether Henderson understood that Resi's treatment of her during the February 2003 incident could have been triggered by his misperception of her laughing at the comment that he had made about not wanting to sign for anymore packages. *See* Regeneron's Ex. E (Transcript of Dr. Andrew P. Levin's Deposition ("Levin Trans.") at 143. Levin stated that Henderson "accepts it as a possibility." *Id*. He also stated that, beyond her statement to him that she felt that Resi's comment was directed at her as a woman, he did not perceive the event as "having a gender content." *Id*. at 143-44. With respect to the October 2003 incident with Mike Parker, Levin testified that Henderson did not describe any sexual connotation to the incident and that she experienced it as a physical assault, not a sexual assault. *See id*. at 166-67. He further stated that Henderson never stated that she felt that Parker

attacked her because she is a woman.  *See id.*

        5.   Jose Monegro's Declaration

In opposition to Regeneron's summary judgment, Henderson has submitted a declaration from another Regeneron employee, Jose Monegro.  *See* Monegro Decl.  In his declaration, Monegro affirms that he observed the following conduct from Henderson's co-workers on the loading dock: (1) "Tyrone Gerald talk about his nights at the Golden Lady"; (2) "the guys humping"; (3) one incident where Henderson's co-workers would not allow her to have more soda; (4) Hoyt would not permit Henderson to park or wash her car on the loading dock but he let Mike Parker do so; and (5) Henderson's co-workers "wouldn't let her chip in to buy things at the Costco Wholesalers."  *Id.*  None of these incidents were mentioned in Henderson's complaint or deposition testimony. Monegro also stated, "I heard about the attack of [Henderson] by Parker from Eugene Thomas.  Eugene told me that he had to grab Parker because he thought Parker was going to beat her up.  He said Parker was so angry, he, Eugene, almost couldn't hold him down."  *Id.*  Monegro further stated that he thought that Henderson's co-workers were "very disrespectful" and that they "treated Eileen very badly."  *Id.*

IV.   Regeneron's Summary Judgment Motion

Regeneron now moves for summary judgment, arguing that Henderson cannot establish any of her claims.  *See* Memorandum of

Law in Support of Defendant's Motion for Summary Judgment
("Regeneron's Memo of Law").  With respect to Henderson's claim
of gender discrimination, Regeneron asserts that Henderson is
unable to establish a *prima facie* case because none of the
alleged discriminatory employment decisions - denial of an office
key, cellular telephone, and overtime hours - were adverse
employment decisions and none of the alleged discriminatory
employment decisions arose under circumstances giving rise to an
inference that Henderson's gender played a role in these three
decisions.  *See id*. at 5-7.  Regeneron further contends that it
has set forth legitimate, non-discriminatory reasons for its
actions.  *See id*. at 7-8.  Finally, Regeneron argues that
Henderson cannot demonstrate that Regeneron's articulated reasons
for these decisions are pretextual because she "has not pointed
to any objectively verifiable evidence in support of her claim."
*Id*. at 8-9.

Regeneron next asserts that Henderson cannot establish a
hostile work environment sexual harassment claim because she
cannot demonstrate that her work environment at Regeneron was
both objectively and subjectively hostile or abusive.  *See id*. at
10-14.  With respect to the subjective prong of the standard
governing hostile work environment claims, Regeneron notes that,
at her deposition, Henderson testified that, at the time she
participated in sexual harassment seminars at Regeneron, she did

not believe that she was experiencing sexual harassment and also
stated that she believed she experienced only "a little bit" of
sexual harassment at Regeneron. *See id*. at 12-13. Regeneron
further asserts that, under the objective test, Henderson's
claims fail because: (1) neither the February 2003 incident with
Joe Resi nor the October 2003 altercation with Michael Parker had
any sexual overtones and Henderson's deposition testimony and
that of her expert psychiatric witness negates any inference that
these incidents were infected by a discriminatory animus; (2) the
alleged name-calling by her co-workers was neither sexual nor
related to her gender, but rather to other non-protected
characteristics such as her weight and a missing tooth; (3) the
locker room behavior is type of conduct that the Supreme Court
held was not actionable in *Oncale v. Sundowner Offshore Serv.,
Inc.*, 523 U.S. 75, 80 (1998); and (4) Henderson's allegations of
isolated sexual comments and incidents of touching do not satisfy
the "severe or pervasive" and "abusive" standard necessary to
state a claim for sexual harassment. *Id*. at 12-14. Regeneron
further asserts that it has an affirmative defense to Henderson's
sexual harassment claim because it has proved that: (1) at all
relevant times, Regeneron had an established comprehensive sexual
harassment policy in place; and (2) Henderson failed to avail
herself of any corrective or preventative opportunities provided
by Regeneron by failing to report to the Human Resources

Department the alleged acts of sexual harassment referred to in the complaint. *See id*. at 15-17.

With respect to Henderson's retaliation claims, Regeneron argues that she cannot make out a *prima facie* case for retaliation under Title VII. *See id*. at 17-21. It asserts that: (1) none of the incidents Henderson reported to the Human Resources related to sex or gender, thus, by reporting them she was not "opposing a practice made unlawful by Title VII"; (2) even if the reports could be deemed protected activity, Henderson has failed to set forth any causal connection between her reports and her subsequent termination; and (3) with respect to her February 2003 complaint to Human Resources, the alleged retaliation – that her co-workers stopped talking to her and began excluding her from their conversations – does not constitute an adverse employment action. *Id*. at 18-19. Further, Regeneron asserts that "the documentary record . . . amply demonstrates that Henderson['s] termination was fully justified by a history of tardiness, insubordination, and unprofessional conduct which increased dramatically just prior to her termination." *Id*. at 19.

Finally, Regeneron asserts that Henderson has failed to state a claim for intentional infliction of emotional distress. *See id*. at 23-24.

In response to Regeneron's assertion that she cannot state a

claim of sexual harassment, Henderson argues that: (1) even if the February 2003 and October 2003 incidents were sex-neutral, they should be considered in the Court's analysis of the hostility of the environment; (2) in assessing the hostility of the environment, the Court must consider unreported as well as reported conduct in determining whether she has made out a *prima facie* case of sexual harassment; and (3) her statement that she experienced sexual harassment "a little bit" "cannot be treated as an admission that she wasn't 'subjectively' offended by the conduct in the face of all of the other evidence that she was." Memorandum of Law in Opposition to Defendant's Motion for Summary Judgment (Henderson's Memo of Law) at 5-10.  With respect to Regeneron's affirmative defense, Henderson argues that the defense is not available to Regeneron because Robert Hoyt, Henderson's supervisor, was a "regular participant in the locker room antics to which [she] objected."  *Id*. at 10.  Additionally, she contends that Regeneron cannot avail itself of the defense because, as Henderson's supervisor, Hoyt was charged with a duty to act on his knowledge of the conduct of Henderson's co-workers and stop the harassment.  *See id*. at 10-11.  Henderson also contends that she did, in fact, avail herself of the corrective and preventative opportunities provided by Regeneron by complaining to Grimaldi that "she was not being treated like a lady, that she was being treated disrespectfully and about the

language used by men in the department." *Id*. at 11-12.

With respect to her retaliation claim, Henderson first argues that, in asserting that she did not oppose a practice made unlawful by Title VII, Regeneron "presumes that a jury would agree what Grimaldi admits Ms. Henderson said to her did not have to do with sex or gender." *Id*. at 13. Second, Henderson contends that, in addition to her suspension without pay and termination, "Hoyt's memos to Ms. Henderson's personnel file respecting conduct on her part which had not even been the subject of comment the year before let alone a memo to the file" constituted an adverse employment action in that they were "reprimands" and "a necessary prerequisite to Hoyt's ability to terminate Ms. Henderson." *Id*. at 13-14. Henderson states, "The proximity of Hoyt's campaign to create the documentation necessary to terminate Ms. Henderson to Ms. Henderson's reporting of him to Grimaldi, a scant three weeks, is enough by itself to create the inference that there is a causal connection between Ms. Henderson's report and Hoyt's retaliatory acts." *Id*. at 14.

Next, Henderson asserts that her gender discrimination claim is not based on Regeneron's failure to provide her with a pager and a key to the office; rather, these incidents are part of the harassment she endured while working at Regeneron. *See id*. at 15-16. She maintains that her gender discrimination claim rests on "Regeneron's discriminatory refusal to provide [her] with over

time opportunities and its termination of her following Mike

Parker's attack." *Id*. at 16. With respect to the denial of

overtime, Henderson asserts that she repeatedly asked Mike Kaplan

for overtime hours in the Facilities Department but "[h]e always

had an excuse why he couldn't give it to her." *Id*. She also

claims that there is additional evidence in the record that

demonstrates that she wanted and needed overtime, including that

she was experiencing serious financial difficulties that caused

her to seek a loan and a salary advance from Regeneron and that

she obtained part-time jobs at UPS and Sam's Club. *See id*. at

17-18.

Finally, Henderson argues that she has stated a claim for

intentional infliction of emotional distress. *See id*. at 23-24.

She contends that, beyond the discriminatory acts of her

supervisor and co-workers, "there are additional facts from which

a jury might conclude that Regeneron's handling of the attack [by

Mike Parker] and its horrific impact on [Henderson] were in fact

atrocious, egregious, outrageous, and utterly intolerable in a

civilized community." *Id*. at 24.

In her declaration in opposition to Regeneron's motion for

summary judgment, Henderson makes further specific allegations of

sexual harassment. She asserts that two of her co-workers,

Tyrone Gerald and Eugene Thomas, who shared a computer and desk

space right next to Henderson, often went on the internet to a

website called "Black Planet" and pulled up pictures of women, usually dressed in some kind of bikini, and commented about the women and their body parts. *See id*. at ¶ 12. Henderson also states that Gerald told stories in front of Henderson about women at a strip club he frequented in the Bronx. *See id*. at ¶ 13. Finally, according to Henderson, on one occasion, she returned to her desk in the Shipping and Receiving office to find her computer screen covered with yellow post-it notes with penises drawn on them. *See id*. at ¶ 13.

In its reply, Regeneron argues that: (1) the Court should not consider the new allegations of sexual harassment asserted by Henderson in her opposition or the new allegation that her termination was discriminatory; (2) any portions of Henderson's declaration in opposition to the motion for summary judgment that contradict her deposition testimony should not be considered; (3) Henderson has failed to submit any admissible evidence in support of her sexual harassment claim; and (4) its affirmative defense to Henderson's sexual harassment claim is available because the alleged harassment did not end in a tangible employment action and Henderson's assertion that she complained about her co-workers' behavior to Hoyt and Grimaldi is contradicted by her deposition testimony. *See* Reply Memorandum of Law.

I.  Summary Judgment Standard

Rule 56 of the Federal Rules of Civil Procedure provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c); *Cronin v. Aetna Life Ins. Co.*, 46 F.3d 196, 202 (2d Cir. 1995).  "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986) (emphasis in original).  "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."  *Id.* at 248.  In order for there to be a genuine issue for trial, there must be sufficient evidence in the record to support a jury verdict in the non-moving party's favor.  *See id.* at 249.  When making a summary judgment determination, "the court must view the evidence in the record in the light most favorable to the non-moving party, drawing all reasonable inferences in that party's favor."  *Abdu-Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 466 (2d Cir. 2001).

In opposing a motion for summary judgment, the non-moving party must "go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).  Mere conclusory allegations and denials are insufficient to create a genuine issue of fact; rather, the opposing party must set forth "concrete particulars" showing that a trial is necessary.  *BellSouth Telecommunications, Inc. v. W.R. Grace & Company-Conn.*, 77 F.3d 603, 615 (2d Cir. 1996)(internal quotations omitted).

II.  Henderson's Disparate Treatment Claim

Before addressing the merits of Henderson's gender discrimination claim, the Court must resolve the dispute over which actions of Regeneron serve as the basis of her claim.  In her complaint, Henderson alleges that Regeneron discriminated against her on the basis of her gender by denying her a pager, a key to the Shipping and Receiving office, and the opportunity to work overtime.  In her opposition to Regeneron's summary judgment motion, however, Henderson asserts that her gender discrimination claim "does not rest upon Regeneron's failure to provide her with a pager and a key to the office."  Henderson's Memo of Law at 15.  Instead, she claims that her claim is based on "Regeneron's discriminatory refusal to provide [her] with over time

opportunities and its termination of her following Mike Parker's attack." *Id.* at 16. By failing to oppose Regeneron's motion as it relates to her allegations of gender discrimination premised on Regeneron's refusal to provide her with an office key and a pager, Henderson has abandoned these claims. *See McKnight v. Dormitory Auth. of the State of New York*, 189 F.R.D. 225, 232-33 (N.D.N.Y. 1999). Accordingly, the Court should dismiss Henderson's gender discrimination claim to the extent that it is based on the denial of an office key and pager. *See id.* at 233.

In contrast to the assertions in her opposition to Regeneron's summary judgment motion, Henderson's complaint did not allege that her termination from Regeneron was based on gender discrimination. The only claim premised on her termination was her retaliation claim. By now arguing that her termination was discriminatory, Henderson is attempting to amend her complaint and bolster her claim of gender discrimination. "A complaint cannot be amended merely by raising new facts and theories in plaintiffs' opposition papers, and hence such new allegations and claims should not be considered in resolving the motion." *Southwick Clothing LLC v. GFT (USA) Corp.*, No. 99 CV 10452, 2004 WL 2914093, at *6 (S.D.N.Y. Dec. 15, 2004). *See also Khan v. Abercrombie & Fitch, Inc.*, No. 01 Civ. 6163, 2003 WL 22149527, at * 11-*12 (S.D.N.Y. Sept. 17, 2003). Accordingly, this Court should not consider Henderson's claim of gender

discrimination based on her termination.  The only remaining
claim of gender discrimination, thus, rests on Regeneron's
alleged failure to provide her with the opportunity to work
overtime.

Claims of disparate treatment under Title VII are analyzed
under the burden-shifting approach set forth in *McDonnell Douglas*
*Corp. v. Green*, 411 U.S. 792 (1973).  Under this framework, a
plaintiff claiming disparate treatment must first establish a
*prima facie* case of discrimination by demonstrating that: (1) she
is a member of a protected class (2) she was performing her
duties satisfactorily; (3) she suffered an adverse employment
decision; and (4) the adverse decision was made under
circumstances giving rise to an inference of discrimination.  *See*
*McDonnell Douglas,* 411 U.S. at 802; *Mario v. P & C Food Markets,*
*Inc.*, 313 F.3d 758, 767 (2d Cir. 2002).  Once the plaintiff has
set forth a *prima facie* case, a presumption of discrimination
arises and the burden shifts to the defendant to proffer a
legitimate, non-discriminatory reason for the adverse decision or
action.  *See Mario*, 313 F.3d at 767.  If the defendant satisfies
this burden of production, "the presumption of discrimination
created by the *prima facie* case drops out of the analysis, and
the defendant 'will be entitled to summary judgment . . . unless
the plaintiff can point to evidence that reasonably supports a
finding of prohibited discrimination.'" *Id*. (quoting *James v.*

*N.Y. Racing Ass'n*, 233 F.3d 149, 154 (2d Cir.2000)).

Here, Henderson has failed to establish a *prima facie* case of discrimination because she cannot demonstrate that the alleged denial of overtime hours constituted an adverse employment action. Henderson alleged in her complaint that, despite her repeated requests, Hoyt refused to allow her to work overtime, but gave all the men in the Shipping and Receiving Department overtime hours. Henderson, however, has put forth no evidence to establish that she was actually denied the opportunity to work overtime. During her deposition, she admitted that she never asked Hoyt or Deyo, the Facilities manager, about getting overtime. *See* Henderson Trans. at 362-63, 366-67. She further testified that, on the *one* occasion that she asked for overtime, she received it. *See id*. at 365-66. While Henderson alleges in her declaration in opposition to Regeneron's motion for summary judgment that she repeatedly asked for overtime hours, this belated assertion contradicts her deposition testimony and does not suffice to create a genuine issue of fact. *See Hayes v. New York City Dept. of Corrections*, 84 F.3d 614, 619 (2d Cir. 1996)("[A] party may not create an issue of fact by submitting an affidavit in opposition to a summary judgment motion that, by omission or addition, contradicts the affiant's previous deposition testimony.").

Even if Henderson could make out a *prima facie* case of

gender discrimination, summary judgment should be granted to Regeneron on this claim because it has set forth a legitimate, non-discriminatory reason for the alleged adverse employment action and Henderson has failed to demonstrate that Regeneron's articulated reason is pretextual. Regeneron asserts that the reason Henderson was not given overtime hours was because she never asked her supervisor for overtime work. This is sufficient to satisfy its minimal burden under the *McDonnell Douglas* framework and, thus, the burden shifts to Henderson to demonstrate that this stated reason is merely pretextual and that discrimination was the true motivating factor. To satisfy this burden, a plaintiff must show that "a discriminatory reason more likely motivated the employer or . . . that the employer's proffered explanation is unworthy of credence." *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 256 (1981). Here, Henderson has failed to offer any evidence from which a reasonable jury could conclude that her gender was a motivating factor in the denial of overtime hours or that Regeneron's stated reason is not credible. Henderson merely asserts that, because she was the only woman in the Shipping and Receiving Department and she did not work overtime hours, the denial of the opportunity to work overtime was discriminatory. Without any evidence to support her claim, this conclusory assertion is insufficient to create a genuine issue of fact. *See Cameron v.*

*Community Aid For Retarded Children, Inc.*, 335 F.3d 60, 63 (2d Cir. 2003)("'[P]urely conclusory allegations of discrimination, absent any concrete particulars,' are insufficient" to defeat a motion for summary judgment).  As this Court has previously stated,

> It is not enough simply to be a member of a protected class.  To invoke the protections of Title VII, an employee must have been subjected to discrimination. A plaintiff who could have been subjected to discrimination by virtue of being a member of a protected class, but was not, could reap an unwarranted windfall if her Title VII claim survives summary judgment in the absence of any proof of discrimination.

*Campbell v. Alliance Nat. Inc.*, 107 F.Supp.2d 234, 251 (S.D.N.Y.,2000).

Accordingly, it is recommended that the Court grant summary judgment to Regeneron on Henderson's disparate treatment claim.

III. <u>Sexual Harassment</u>

It is well-settled that Title VII's prohibition against gender discrimination extends to sexual harassment claims.  *See Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 63-68 (1986). There are two types of sexual harassment under Title VII that courts have recognized, namely, *quid pro quo* harassment and hostile work environment harassment.  *See Mormol v. Costco Wholesale Corp.*, 364 F.3d 54, 57 (2d Cir. 2004).  Here, Henderson claims that, while working at Regeneron during the year 2003, she

was subjected to a hostile work environment.[3]  Her claim is based on the following alleged incidents and conduct of her co-workers: (1) the February 2003 altercation with Joe Resi; (2)the October 2003 incident with Mike Parker; (3) name-calling by her co-workers; (4) exposure to sexual comments and horseplay among her male co-workers; (5) inappropriate touching by one of her male co-workers; (6) a co-worker telling her that "she needed a man" and that she should go out with him so that he could treat her like a lady; (7) a complaint from one of her co-workers that Henderson was paid more than him and that this was unfair because he was a man; and (8) making fun of her hair.  *See* Amended Compl. at ¶¶ 9-20.  In her declaration in opposition to Regeneron's summary judgment motion, Henderson alleges additional incidents of sexual harassment that she did not previously raise in her amended complaint or at her deposition.  *See* Henderson Decl. at ¶¶ 12-13.  In fact, at her deposition, counsel for Regeneron asked Henderson whether she had mentioned everything that made her feel uncomfortable at Regeneron during the year 2003, the year that Henderson had specified was when she began to experience harassment in the workplace, and Henderson responded that she had testified to everything that affected her.  *See*

_____

[3] In her complaint, Henderson does not specify the time period during which the harassment allegedly occurred.  However, at her deposition, she testified that she did not begin to experience what she perceived to be sexual harassment until sometime in 2003.  *See* Henderson Trans. at 147.

Henderson Trans. at 281-82.  Because Regeneron was not put on notice of these new allegations and the assertion of these new facts in her declaration in opposition contradicts her deposition testimony, ths court should not consider them.  *See Hayes*, 84 F.3d at 619.  For the same reason, the new facts included in the declaration of Jose Monegro that were neither alleged in Henderson's complaint nor testified to by Henderson should not be considered by the Court.

To prevail on a claim of sexual harassment based on a hostile work environment, a plaintiff must show that: (1) "the harassment was sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment"; and (2) "a specific basis exists for imputing the objectionable conduct to the employer."  *Fairbrother v. Morrison*, 412 F.3d 39, 48-49 (2d Cir. 2005)(internal citations and quotation marks omitted).  Thus, "in considering a motion for summary judgment, a court must ask whether a rational fact-finder could conclude, on the basis of evidence in the record, that the conditions of plaintiffs' employment were sufficiently severe or pervasive to create an objectively hostile or abusive work environment."  *Dawson v. County of Westchester*, 373 F.3d 265, 274 (2d Cir. 2004).

"The first element of a hostile work environment claim has both an objective and subjective component: 'the misconduct must

be severe or pervasive enough to create an objectively hostile or abusive work environment, and the victim must also subjectively perceive that environment to be abusive.'" *Petrosino v. Bell Atlantic*, 385 F.3d 210, 221 (2d Cir. 2004)(quoting *Terry v. Ashcroft*, 336 F.3d 128, 148 (2d Cir. 2003)). "As a general rule, incidents must be more than 'episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive.'" *Alfano v. Costello*, 294 F.3d 365, 374 (2d Cir. 2002)(quoting *Perry v. Ethan Allen, Inc.*, 115 F.3d 143, 149 (2d Cir. 1997)). In determining whether a plaintiff has established a hostile work environment claim, courts must look to the "totality of the circumstances," taking the following factors into consideration: (1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; (4) and whether the conduct unreasonably interferes with an employee's work performance. *Dawson v. Cty. of Westchester*, 373 F.3d 265, 272 (2d Cir. 2004). Moreover, such a claim "must be evaluated on the basis of the cumulative effect of the abusive conduct." *Id*. at 274. In *Dawson*, the Second Circuit Court of Appeals held:

> [I]n a gender-based hostile environment case . . ., the crucial question is not simply whether the remarks to which plaintiffs were subjected were of an explicitly sexual nature. It is rather whether the workplace atmosphere, considered as a whole, undermined plaintiffs' ability to perform their jobs, compromising their status as equal to men in the workplace.

*Id.* However, "it is 'axiomatic' that in order to establish a sex-based hostile work environment under Title VII, a plaintiff must demonstrate that the conduct occurred because of her sex." *Alfano*, 294 F.3d at 374.

Here, Regeneron challenges Henderson's claim under both the subjective and objective tests. It points to the following statements of Henderson to demonstrate that she did not believe that the conduct of which she now complains was severe or pervasive: (1) Henderson's admission at her deposition that she experienced only "a little bit" of sexual harassment while working at Regeneron; (2) her testimony that, at the time she participated in sexual harassment seminars at Regeneron, she did not believe that she was experiencing sexual harassment; and (3) in response to the question on the EEOC questionnaire regarding how she had been harmed, Henderson put a question mark next to the words "sexual harassment." *See* Regeneron's Memo of Law at 12-13.

With respect to some of the alleged incidents of harassment, Henderson's testimony at her deposition makes clear that she did not subjectively perceive them as severe or pervasive harassing conduct. First, Henderson testified that she did not believe Tyrone Gerald's touching of her to be sexual harassment. *See* Henderson Trans. at 148. When asked whether her perception of Gerald's conduct changed after having gone through seminars in

which she learned what constituted sexual harassment, Henderson
stated, "A little bit." *Id.* at 149. She also testified that she
never told anyone that she thought she was being sexually
harassed by Gerald. *See id.* Further, Henderson indicated that
she did not believe the treatment that she received from Joe Resi
in February 2003 to be sexual harassment. *See id.* at 177.
Henderson was asked at her deposition whether she had perceived
what Resi had said to her as sexual harassment and she responded,
"No, I thought he was very disrespectful." *Id.* Further, Gail
Grimaldi indicated that, when Henderson complained to her about
the incident with Resi, she never stated that Resi's conduct
related to the fact that she is a woman or that she felt sexually
harassed. *See* Grimaldi Aff. at ¶ 16; Grimaldi Trans. at 10.
With respect to the locker room behavior and horseplay that
Henderson alleged in her complaint created a hostile work
environment, Henderson testified at her deposition that she did
not find that behavior to be sexual harassment, but "found it
uncomfortable sometimes." Henderson Trans. at 439. When asked
what she found "uncomfortable" about this behavior, Henderson
offered the following testimony:

> A:  Because sometimes it used to be in the office.
>     It is a small area. You know, I didn't want to
>     get bumped. I didn't want to get hit or
>     knocked down. You know, when it was in the
>     dining room area I would stay in the office,
>     and I let them play or, you know, not that I
>     let them, but, you know, I don't have to see
>     that. I hear it, but I don't have to see it .

> . . .

> Q:   If you were concerned about it, why didn't you
>      go to Gail and talk to her about it?

> A:   Because that is dumb.  As long as they – as
>      long as they don't touch me and bother, **I have
>      no problem with it.**

*Id.* at 439-40 (emphasis added).  Additionally, Henderson

testified that, despite having gone through seminars on sexual

harassment offered by Regeneron, she did not perceive certain

conduct that she stated had occurred in 2003 - the name-calling

and touching of her hair by her co-workers and inappropriate

comments and touching by Mike Parker – to be sexual harassment at

the time that they occurred.  *See* Henderson Trans. at 147-52, 54.

Finally, with respect to Henderson's allegation in her complaint

that one of her co-workers commented that he should earn more

money than her because he is a man, Henderson has offered no

evidence to create a genuine issue of fact as to whether she

subjectively perceived this incident to be sexual harassment.  In

fact, she has offered no evidence at all relating to this

incident.  She did not testify to this incident at her deposition

nor does she refer to it in her declaration in opposition to

Regeneron's summary judgment motion.

Henderson now argues that, although she testified that she

did not perceive most of the conduct of which she now complains

to be sexual harassment, this testimony should not be construed

as an admission that she was not subjectively offended.  *See*

45

Henderson's Memo of Law at 9. She states that "[i]t is clear from the testimony that Ms. Henderson had no idea what sexual harassment was" and that this is understandable because she is not a lawyer and she only has a high school education. *Id*. In light of her admission that she attended seminars at Regeneron where she learned what types of behavior are encompassed by the prohibition against such harassment, Henderson cannot now assert ignorance of the legal definition to evade her testimony. Moreover, at her deposition, Henderson offered the following testimony:

> Q: [D]uring the class that you took, was there a description as to what sexual harassment was?
>
> A: They broke it down and things like that.
>
> Q: And what do you remember being told what sexual harassment was at those meetings.
>
> A: If someone touches you, that is sexual harassment, which I already knew that anyway. When someone gets fresh with you, making advances at you.

Henderson Trans. at 68-69. Contrary to Henderson's assertion, the testimony actually shows that Henderson, in fact, was aware of what constituted sexual harassment.

While Henderson arguably believed some of the conduct constituted abusive conduct – Mike Parker's touching and the October 2003 altercation – all of the incidents, taken together, fail to meet the objective standard for sexual harassment. "The objective severity of harassment should be judged from the

46

perspective of a reasonable person in the plaintiff's position,
considering all the circumstances." *Oncale*, 523 U.S. at 75, 81
(1998)(internal citation omitted). While a reasonable person in
Henderson's position may deem some of the alleged incidents as
inappropriate, such as Mike Parker commenting about dating
Henderson and touching her and Tyrone Gerald touching her, there
is nothing in the record to show that these incidents were either
severe or pervasive. Indeed, in her complaint, Henderson alleged
only two incidents of inappropriate touching and indicated that
Mike Parker made inappropriate comments to her on one occasion.
Moreover, Henderson testified that after the one time that Mike
Parker touched her, she told him to stop and he did. *See*
Henderson Trans. at 315. This behavior, while it may have made
Henderson uncomfortable, can hardly be considered "sufficiently
continuous and concerted to have altered the conditions of her
employment." *Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 570 (2d
Cir. 2000)(internal quotation omitted). Furthermore, the alleged
name-calling, touching of Henderson's hair, and the locker room
behavior and horseplay can also not be deemed so severe or
pervasive that they altered the conditions of Henderson's
employment and created an abuse working environment. The Second
Circuit has noted that "[s]imple teasing, offhand comments, or
isolated conduct (unless extremely serious) will not support a
claim of discriminatory harassment." *Petrosino*, 385 F.3d at 223.

Finally, while a reasonable person would almost certainly view the actions of Joe Resi in February 2003 and Mike Parker in October 2003 toward Henderson as highly inappropriate treatment of a co-worker, Henderson has failed to establish that either incident was based on her gender. There is nothing in the record to show that either incident had any sexual connotation to it. However, "[f]acially neutral incidents may be included . . . among the 'totality of the circumstances' that courts consider in any hostile work environment claim, so long as a reasonable fact-finder could conclude that they were, in fact, based on sex." *Alfano*, 294 F.3d at 378. Henderson has failed to "establish[] a basis from which a reasonable fact-finder could infer that those incidents were infected by discriminatory animus." *Id*. at 377. As noted above, Gail Grimaldi indicated that Henderson never stated to her that she thought Joe Resi's conduct was due to her gender. Moreover, Henderson does not point to any other specific conduct of Joe Resi that indicates that he harbored any discriminatory bias against Henderson based on her sex. *See Howley v. Town of Stratford*, 217 F.3d 141, 155-56 (2d Cir. 2000)(holding that fact-finder could reasonably infer that facially sex-neutral incidents were sex-based where the perpetrator had previously made sexually derogatory statements). With respect to the incident with Mike Parker, Henderson alleges in her declaration in opposition to Regeneron's summary judgment

motion that Parker attacker her "for no reason at all."
Henderson Decl. at 8.  Nowhere does she state that Parker was
motivated by a discriminatory bias.  Moreover, her psychiatric
expert, Dr. Levin, testified that Henderson did not describe any
sexual connotation to the incident nor did she state that Parker
attacked her because she was a woman.  *See* Regeneron's Ex. E
(Levin Trans.) at 166-67.

Accordingly, without any evidence to establish that her work
environment was both subjectively and objectively abusive,
Henderson has failed to create a genuine issue of fact with
respect to her claim of sexual harassment.  The Court, therefore,
does not need to consider Regeneron's affirmative defense and
should grant summary judgment to Regeneron on this claim.

IV.  <u>Retaliation</u>

Like disparate treatment claims under Title VII,
retaliation clams are analyzed under the *McDonnell Douglas*
burden-shifting framework.  *See Terry v. Ashcroft*, 336 F.3d 128,
141 (2d Cir. 2003).  To state a *prima facie* case of retaliation
under Title VII, "an employee must show (1) participation in a
protected activity; (2) that the defendant knew of the protected
activity; (3) an adverse employment action; and (4) a causal
connection between the protected activity and the adverse
employment action."  *Jute v. Hamilton Sustrand Corp.*, 420 F.3d
166, 173 (2d Cir. 2005)(internal quotation marks and citation

omitted).

Here, Henderson alleges that, in retaliation for reporting the February 2003 incident to the Human Resources Department, the harassing and discriminatory conduct of Hoyt and her co-workers increased. *See* Amended Compl. at ¶ 35. In her opposition papers, Henderson further alleges that, after she reported this incident to Human Resources, Hoyt began writing disciplinary memoranda to her personnel for conduct that he had not written her up for in the past. *See* Henderson Decl. at ¶ 20; Henderson's Memo of Law at 13-14. She also claims that Hoyt took away her job responsibilities and she was later suspended without pay and terminated from Regeneron as a direct result of her complaints about the October 2003 incident with Mike Parker. *See* Amended Compl. at ¶¶ 36-37.

Regeneron argues that Henderson has failed to establish a *prima face* case of retaliation. It asserts that, by reporting the February 2003 incident and other alleged conduct and the October 2003 incident to the Human Resources Department, Henderson was not engaged in protected activity because none of the incidents related to sex or gender. *See* Regeneron's Memo of Law at 18. Regeneron further contends that, with respect to Henderson's retaliation claim relating to the February 2003 report, the claimed retaliation does not rise to the level of an adverse employment action. *See id*. at 18-19.

To establish the first prong of the *prima facie* case, "the plaintiff need not establish that the conduct she opposed was actually a violation of Title VII, but only that she possessed a good faith, reasonable belief that the underlying employment practice was unlawful under that statute." *Galdieri-Ambrosini v. Nat'l Realty & Dev. Corp.*, 136 F.3d 276, 292 (2d Cir. 1998)(internal quotation marks and citations omitted). Here, Henderson has failed to establish that she reasonably believed that the conduct of which she was complained in February and October of 2003 violated Title VII. When Henderson visited Grimaldi in February 2003, she complained about the incident with Joe Resi and that Hoyt had treated her unfairly by not providing her with an office key and a pager, not saying good morning to her, and speaking to her in a rude manner. *See* Henderson Trans. at 177-82. However, Henderson never complained to Grimaldi that she believed the incidents were related to the fact that she is woman. *See* Grimaldi Aff. at ¶ 16; Grimaldi Trans. at 110. Moreover, Henderson testified at her deposition that she did not consider Joe Resi's behavior to be sexual harassment. *See* Henderson Trans. at 177. Similarly, Henderson cannot establish that she reasonably believed that Mike Parker's behavior during the October 2003 incident was in violation of Title VII. As explained above, Henderson has wholly failed to set forth any evidence to show that she subjectively believed that Mike

Parker's conduct constituted sexual harassment and any other conduct prohibited by Title VII.  Most notably, in her opposing declaration, Henderson asserted that Parker attacked her "for no reason at all."  Henderson Decl. at 8.

With respect to the second element of the *prima facie* case, "implicit in the requirement that the employer have been aware of the protected activity is the requirement that it understood, or could reasonably have understood, that the plaintiff's opposition was directed at conduct prohibited by Title VII."  *Galdieri-Ambrosini*, 136 F.3d at 292.  In reporting these incidents, Henderson did not state that she believed that they were based on her gender and there was nothing in her reports that could reasonably have led Regeneron to understand that that was the nature of her complaints.  Her testimony and the testimony of Grimaldi as to the complaints she made are described above. Neither Henderson nor Grimaldi indicated that Henderson reported that she was being discriminated against on the basis of her gender.  Henderson now argues that "[t]here can be no question that [Regeneron] knew what she was complaining about" because she "was complaining about bad language and disrespect in a department in which she was the only woman and not being treated like a lady by her co-workers."  Henderson's Memo of Law at 13. Even assuming that Henderson did, in fact, complain about the language of her co-workers in addition to the complaints listed

above, which is not entirely clear from the record, such a vague complaint, without any allegation that it was continuously directed at her or had some sexual connotation, would not put Regeneron on notice that Henderson believed that she was being subjected to gender discrimination in violation of Title VII. *See, e.g., Benette v. Cinemark U.S.A., Inc.*, 295 F.Supp.2d 243, 251 (W.D.N.Y. 2003) (finding that alleged vulgar language, if proven, was not sufficiently severe or pervasive to create hostile work environment based on sex)*.*

With respect to the third prong of the *prima facie* case, as Regeneron concedes, it is clear that Henderson's suspension without pay and termination constitute adverse employment actions. *See, e.g., Feingold v. New York*, 366 F.3d 138, 152 (2d Cir. 2004)(termination of employment constitutes adverse employment action); *Lovejoy-Wilson v. NOCO Motor Fuel, Inc.*, 263 F.3d 208, 223-24 (2d Cir. 2001)(one-week suspension without pay is an adverse employment action).  Furthermore, Hoyt's numerous memoranda written to Henderson's personnel file and his decision to take away Henderson's job responsibilities, if true, constitute adverse employment actions.  The Second Circuit has held that "significantly diminished material responsibilities" amounts to a material change in the terms and conditions of employment.  *See, e.g., Fairbrother*, 412 F.3d at 56.  Here, Henderson alleges that, after she returned to work from her

suspension, Hoyt did not give her any work to do.  Assuming this allegation is true, it clearly amounts to a significant decrease in Henderson's material responsibilities.  Courts have also held that "disciplinary memoranda and evaluations are adverse employment actions only if they affect ultimate employment decisions such as promotions, wages or termination." *Regis v. Metro. Jewish Geriatric Ctr.*, 97 Civ. 0906, 2000 WL 264336, at *8 (S.D.N.Y. Jan. 11, 2000).  Here, the memoranda written to Henderson's file during 2003 were what ultimately led to Henderson's termination, thus, they can be deemed adverse employment actions.

Henderson, however, has failed to establish that the alleged retaliatory harassment constitutes an adverse employment action. Retaliatory harassment may amount to an actionable adverse employment action if it works a materially adverse change in the terms and conditions of one's employment.  *See Richardson v. New York State Dep't of Corr. Servs.*, 180 F.3d 426, 446 (2d Cir. 1999).  Henderson alleges that, after she made complaints, her co-workers excluded her from conversations and made negative comments about her and Hoyt stopped talking to her.  Under the standard set forth in *Richardson*, such conduct does not rise to the level of an adverse employment action because Henderson has failed to set forth any evidence, beyond her conclusory allegations, to establish that these alleged actions caused her

54

to suffer a material change in the terms and conditions of her employment.  *See Davis v. Verizon Wireless*, 389 F.Supp.2d 458, 478(W.D.N.Y. 2005)("Menacing looks, name calling, or being shunned by co-workers does not constitute an adverse employment action." ); *Quarless v. Bronx-Lebanon Hosp. Ctr.*, 228 F.Supp.2d 377, 385-86 (S.D.N.Y. 2002)(holding that, where plaintiff failed to identify any specific acts of the defendant that materially changed the terms and conditions of his employment, general allegations that he was "harassed, shunned, and subjected to an intimidating work environment" did not create a genuine issue of material fact as to whether he suffered an adverse employment action).

Although certain alleged actions of Regeneron constitute adverse employment actions, Henderson has failed to put forth any evidence from which a jury could reasonably conclude that the complaints she made in February 2003 and October 2003 constituted protected activity and has, therefore, failed to state a *prima facie* case of retaliation.  Thus, summary judgment should be granted to Regeneron on this claim.

V.   New York Human Rights Law Claim

New York state courts require the same standard of proof for claims brought under NYHRL as those brought under Title VII, thus, Title VII and NYHRL claims can be analyzed in tandem. *Fierro v. Saks Fifth Ave.*, 13 F.Supp.2d 481, 488 (S.D.N.Y. 1998).

Accordingly, for the foregoing reasons, summary judgment should be granted to Regeneron on Henderson's claims under the New York Human Rights Law.

## VI. Intentional Infliction of Emotional Distress

Under New York law, to state a claim of intentional infliction of emotional distress, a plaintiff must establish four elements: (1) extreme and outrageous conduct, (2) intent to cause severe emotional distress, (3) a causal connection between the conduct and the injury, and (4) severe emotional distress." *Bender v. City of New York*, 78 F.3d 787, 790 (2d Cir. 1996)(citing *Howell v. New York Post Co.*, 81 N.Y.2d 115, 121, 596 N.Y.S.2d 350, 353, 612 N.E.2d 699, 702 (1993)). New York courts have the standard for establishing extreme and outrageous conduct very high. In order to be considered outrageous, "the conduct [must] be so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Cheung v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 913 F.Supp. 248, 254 (S.D.N.Y. 1996)(internal citations omitted).

In this case, in cannot be said that the actions alleged by Henderson rise to the level of extreme and outrageous conduct necessary to sustain a claim for intentional infliction of emotional distress. First, "[w]rongful termination, even for

'retaliatory and discriminatory reasons in violation of various state and federal laws' does not satisfy the standard for intentional infliction of emotional distress." *Lavigna v. Capital Cities*, No. 96 Civ. 7734, 1997 WL 4599, at *1 (S.D.N.Y. Jan. 7, 1997). Second, the harassing conduct of Henderson's co-workers and supervisors and the physical altercation with Mike Parker alleged by Henderson, while inappropriate if true, fall far short of extreme and outrageous conduct. *See Carroll v. Bayerische Landesbank, BLB*, 150 F.Supp.2d 531, 538 (S.D.N.Y. 2001)(holding that alleged hostile and degrading remarks and physical push and shove against a door did not amount to extreme and outrageous conduct); *Ponticelli v. Zurich American Ins. Group*, 16 F.Supp.2d 414, 440-41 (S.D.N.Y. 1998)("In the sexual harassment context, it appears that for an [intentional infliction of emotional distress claim to survive a summary judgment motion, sexual battery should be alleged."). Thus, because Henderson has failed to offer any evidence of extreme and outrageous conduct that would satisfy the rigorous standard required under New York law to sustain a claim of intentional infliction of emotional distress, the Court should grant Regeneron's summary judgment motion as to this claim.

## CONCLUSION

For the foregoing reasons, it is recommended that your Honor grant Regeneron's motion for summary judgment and dismiss Henderson's claims.

## NOTICE

Pursuant to 28 U.S.C. § 636(b)(1), as amended, and Rule 72(b), Fed. R. Civ .P., the parties shall have ten (10) days, plus an additional three (3) days, pursuant to Rule 6(e), Fed. R. Civ. P., or a total of thirteen (13) working days, (*see* Rule 6(a), Fed. R. Civ. P.), from the date hereof, to file written objections to this Report and Recommendation. Such objections, if any, shall be filed with the Clerk of the Court, with extra copies delivered to the chambers of The Honorable Charles L. Brieant, at the United States Courthouse, 300 Quarropas Street, Room 275, White Plains New York, 10601, and to the chambers of the undersigned at Room 434, 300 Quarropas Street, White Plains, New York 10601.

Failure to file timely objections to the Report and Recommendation will preclude later appellate review of any order to judgment that will be entered by Judge Brieant. *See Thomas v. Arn*, 474 U.S. 140 (1985); *Frank v. Johnson*, 968 F.2d 298 (2d Cir.), cert. denied 113 S. Ct. 825 (1992); *Small v. Secretary of H.H.S.*, 892 F.2d 15,16 (2d Cir. 1989) (*per curiam*); *Wesolek v. Canadair, Ltd.*, 838 F.2d 55, 58 (2d Cir. 1988). Requests for

extensions of time to file objections must be made to Judge

Brieant and should not be made to the undersigned.

Date: November 17, 2005
White Plains, New York

MARK D. FOX
UNITED STATES MAGISTRATE JUDGE


Copies of the foregoing report and recommendation have been sent
to the following:

The Honorable Charles L. Brieant, U.S.D.J.

Susan Selden Egan, Esq.
Egan Law Firm
258 Broadway
New York, New York 10007

Geri Sprung Krauss, Esq.
Hinshaw & Culbertson LLP
780 Third Avenue
New York, New York 10017